Good afternoon, your honors, and may it please the court. Tyler Krentz on behalf of Sgt. Scott Holslag. If I may reserve three minutes for rebuttal, I'll do my best to keep that time. Sgt. Holslag had to choose between using force or betting his life within split seconds. So, many, many times, and I read all your briefings, so let me see if I can get right to the point. If I conclude that there's a five-minute gap, and it looks like it could be reached in first pockets, but I don't know, and then, I'm sorry, five-second gap, and then five seconds later after the third shot, that he does have, he's turned, his hands are up, but I don't know what happened between in the middle five seconds there from looking at the view evidence. I know that's not what you say in your brief, but that's what I'm trying to, if I was to conclude that, there's a five-second gap, he's doing something, it could be reached in first pockets, but it's not super clear, and then it's like, just assume everything goes fuzzy, five seconds later, third shot goes off, he's turned, and his hands are up. What do I, what do I do with that? I guess more clearly, how can I, Grant, how can I affirm based on that? Not affirm, Grant, rule in your favor, Sarkis' favor. A couple responses, Your Honor. I promise I will engage with the hypothetical, but if I could direct the Court's attention to the video. I think the Exhibit 24B is the composite video that shows all four images at once. That is in real time, so it shows how quickly this is happening. It's very fast. I certainly admit, Your Honor, I've watched it many times myself, but at one minute in on that video, in the top right quadrant, basically in the top right corner of that, as Officer Escalante is moving along the fence line, his body-worn camera footage shows Smith up on the ledge with his hands down, facing the officer, and then it's less than two seconds later that all shots are done firing. So, I would submit that the Court, please take another look. Well, I looked at it, too, okay? I mean, it's a difficult video to watch, obviously, but I just, I couldn't see what you're seeing. I mean, I'm not saying that a jury couldn't believe the officer's rendition of it, but I couldn't, I could see the hands down and then I could see them up, but I couldn't see what the officers would describe, what they would testify to in a trial in that video. So, that's, if I can't see what you're saying is in the video, and we all look at it, how can we rule for you? Well, I admit, Your Honor, the video corroborates the officer's testimony because they show that here, this isn't... Yeah, but that's weighing evidence. We don't weigh evidence here. I mean, what I understood your argument to be is just look at the video. You don't have to worry about what Mr. Smith's side of the story is. You don't have to worry about what the officer's side of the story is. The video will tell you what happened, and you've just heard a second judge say, I can't tell. You could be telling the truth. He could be telling the truth, but I can't answer that question based on the video. Well, at a minimum, Your Honor, the video does show that he reaches towards his pants pockets, because even Planoff admits that in the record in their response to Sergeant Holstein's statement in Planoff's Speed and Material Facts on page 235 of the record. Even Planoff said Mr. Smith did... Yeah, the helicopter, you're talking about the helicopter footage, where it's kind of black and white. I think it was like, it must have been using a heat signature or something. But he's reaching down, but because it's heat signature, you can't tell if he's reaching in, and it's just, you know, and then five seconds later, it's turned, and so I just, I certainly, nothing in the video is inconsistent with what the officers are saying. It seems to me like you might have a really good, you know, you got a whole bunch of officers saying he was reaching. You got video evidence that it's not inconsistent with that. It could be said to be consistent with it. I don't know, it could be said to be, but it's, but, you know, do you agree that for us to rule for you, we have to conclude that he was reaching, that we can tell that he's reaching into his pockets, right? Not under this court's precedent, Your Honor. So in both Cruz v. City of Anaheim and George V. Morris, this court said that when officers are facing someone that they reasonably suspect is person was armed, and then he's commanded to keep his hands up and to not reach, and that person reaches, whether he's reaching for a gun or reaching, as the court put it. Well, he also doesn't have a shirt on either. I mean, his clothing, I don't think, it doesn't make it as suspicious as it would be if he had, reaching down, if he had like a sweatshirt on, and other, he's shirtless. That's true, Your Honor. However, Sergeant Holzleit testified, and this is undisputed, that a .38 revolver can fit in the pockets of those cargo shorts. So... I guess what you're saying is that's what he could say at a trial. I mean, that doesn't, you can't see that on the video. You may be right. It may be that .38 can fit in the pockets of those cargo shorts. You can see the outlines, but that's not what this video says. When you say that, that Mr. Smith ignores the critical split seconds of the video footage before Sergeant Holzleit decided to fire, isn't the critical split seconds where the helicopter footage readjusts its angle and you miss it? No, Your Honor, because the helicopter video footage is the best picture leading up to a point, but then it shifts over. And at that point, the audio source in the next footage becomes Officer Escalante running along the fence line, like I said. As the officer that's behind Holzleit. That's correct, Your Honor. So while he's moving, for the majority of his movement, it's difficult to see up on the ledge. But for a moment as he's moving, you have to watch the video extremely closely. I'd You can see Smith standing with his hands near his waistband, facing the officer. And Your Honor, I think to step back a moment. Does it matter that he doesn't have a gun? No, Your Honor. That's not something that a reasonable officer would have known standing in Sergeant Holzleit's position at the time he fired. Well, if he had had a gun, how would you, how would that hypothetically go into what you're saying right now? So, I don't think it really makes any difference. It really doesn't make any difference. It's whatever that movement was and whatever we can tell from the video. That's right. A reasonable officer in Sergeant Holzleit's position has to see the suspect, evaluate what kind of movement he's doing. And in this situation where he's already been warned that if he does not comply, the police hope will be used and they use the K-9. And he's still not obeying orders. He's still not putting his hands up and said he's reaching down. An officer should be granted the leeway to make a decision. That's a threat on his life. He's having to do that. I can hear you on that. At the same time, it's pretty strong. I mean, I'm not sure there's any rule that basically says if they tell you to put your hands up, but you put your hands down, not in your pockets or something, but you, you know, then you get to get shot. I mean, that's pretty, that would be a pretty strong, pretty harsh rule. I don't, you're not arguing just for that rule, right? That you, that an officer necessarily by having it put his hands down, instead of putting his hands up when he said that that's licensed to shoot by the officer. No, no, no, no. It's the, it's the totality of the circumstances test and a grant. Right. So it has to look to an officer like he needs to use deadly force. And I get that. It's just, I mean, what you're hearing from us is we're having trouble seeing it. I don't want to second guess officers. I understand all of that. Our case law talks about all of that, but I just can't see it. So it's, it's also, I think, it's not just the putting his hands down when he should have been putting his hands up. It's also the repeated disobedience leading up to that moment. The fact that he, I mean, it means that it ups the ante, so to speak, Your Honor. It means that for the officer in the field who's watching this person suddenly make a movement downwards, it turns it from a dangerous situation into very likely a deadly one. Because if the officer misjudges what this person is doing, then the only human factors expert in this record shows that because of basic human reaction time, the cognitive delay needed to recognize what's happening, engage in motor pattern function, and then react. If Smith is pulling a weapon out of his, out of his pockets, or reaching into his pockets and pulling out a weapon, then he's going to be able to fire first. What if Smith, I mean, he's wearing, he's kind of, he has no shirt on or anything, and he's just wearing his pants up? So, Your Honor, that's the same analysis as what if he subjectively intended to do something else. I'm asking you, like, do you think if he was pulling his pants up, but the officer perceived him as, as going for something, then it would be justified? Yes, Your Honor, because it's, it has to be judged. I can't tell if he's pulling his pants up either. That's, that's, but that's the same issue that the officer has to grapple with, and you have to judge it from the reasonable perspective of the officer. Now, if this goes, if this went back to court, and you didn't settle, and it went to trial, I mean, it seems to me like there's a really kind of black and white issue is whether or not he was reaching first pocket or doing something. How would this be tried? I mean, can you ask a jury, can you ask the jury to just decide that one factual question, the thing that we can't see in those few key seconds, sort of was the light red or green, or does it get a lot more complicated than that? Well, I think, I think it's possible to submit a special verdict form to a jury, but, Your Honor, it's, that's too reductive. That, that misapplies the Graham test, which has to account for everything leading up to those split seconds as well. The officers, the, an officer who, and I think this is, really goes also to the second issue, which distinguishes some of the precedent that the district court or plaintiff cited. If an officer walked up to someone and yelled at them to put their hands up, and they put their hands down, the officer fired. Clearly, that would be unconstitutional. But when you look at the, each event leading up to this, where, where Smith had been fleeing as a fugitive for hours already, because he had already evaded a physical pursuit from a different officer in the area, and then was in the shed, warned, come out with your hands up, or you'll be bit by a police dog. They used the police dog, showing Smith that there's serious force being brought to bear. You know, I, I, I understand. When we read the briefing, and, and it reminds me that one of the most powerful things that I thought when I was looking at this, was it seems like when you're looking at these different videos, all of a sudden, they're about this, right, same thing, all the, several of the officers suddenly go for their guns, which would seem to be, and we've, and they're in different spots, and it would seem to indicate that they're, that there's something going on that's triggering all these officers to feel, but the problem is that... And let any other officer shoot them, too. No, but what do we do with that? Like, it seems to me that would be a powerful thing to tell the jury, that it can't be that all these officers suddenly decided to, but I don't know that we can infer from that something that would allow us to reverse the decision. Yes, I think the other officers' actions are, are, in the words of the 10th Circuit and of State v. Taylor, or State of Taylor, largely irrelevant. They're in different positions, they're seeing different things, so the fact that they decided not to shoot does not bear on the judge. Do you want to reserve the balance for a rebuttal? I do, thank you, Your Honor. Thanks. And may I wish the court a good afternoon? I will try not to trespass too much on lunchtime. I would like... Please state your name for the record. Of course, Your Honor. Gene Iredale, and I represent the appellees, the estate of Mr. Smith and his son. With all due respect, Johnson v. Jones is the Supreme Court that controls this court's jurisdiction, and interlocutory appeal is an extraordinary remedy. Because qualified immunity is such an important public policy that is embodied in the law, the defendant in a 1983 case has this extraordinary remedy available, but only within the limited scope of presenting to the court a narrow and pure issue of law. This court in the estate of Anderson held very clearly that when the qualified immunity appeal is nothing more than an attempt to re-argue the summary judgment or have this court weigh evidence or come to a different factual determination than that of the district court, the court is divested of jurisdiction. The court has engaged in a colloquy with counsel here, and the case law, Johnson v. Jones and the estate of Anderson, says the reason why we also focus on qualified immunity is because this court has the institutional competence to establish rules of law. And so in determining... Counsel, can I ask you kind of what I was asking your opposing counsel about, which is if this was to go to a jury, what is there a way to limit the jury to the actual... We can't decide facts. That's what you're basically telling us. We can't decide facts. If there's a fair fact, we can't. That's what Scott, I think it's Scott, says from the Supreme Court. It seems like there's this one kind of key fact in this case that if it goes one way, the officer prevails. If it goes the other way, your client could prevail. So how do we make sure the jury is focused on that fact? Judge Van Dyke, I think that the briefing and the way the case has come about is such that that is just the nature of the case. In other words, that is the issue because of the structure of the evidence. I don't know if the court can in any way pretermit or determine for the trial judge that this is the sole factual issue because... Could the judge ask, I guess what I'm asking is could the judge ask the jury to just address whether or not he was reaching or otherwise acting in a way that would, as opposed to saying, you know, fighting for one part or the other? Yes. The answer to that question is yes. And, in fact, there is some jurisprudence from the court, although it's mixed, that on certain kinds of qualified immunity issues, normally it's to be determined purely on the appeal, but if it turns on a factual issue, a defendant may raise that at trial by requesting a special interrogatory in a verdict form. Well, I think the court, though, can also, and this happens, say we can deny it at this point, after the judge has heard all of the evidence. You're all saying what you're going to do, but after the judge hears all the evidence, if the judge made a determination that there was no dispute as to what your client did, the judge could grant qualified immunity before sending it to a jury. You are 100% right on that. And, actually, you could also do a special interrogatory, or you could grant qualified immunity after the jury comes back. But the point why we're here is somewhat of the policy of qualified immunity is you shouldn't have to make someone go to trial  So, one thing that I've noticed, and it seems to be a bit of an issue to share, I've been doing these cases for a long time, and we always just said, okay, it's an interlocutory appeal on qualified immunity or whatever, we have jurisdiction. Now, it seems to be this little murky, it seems to be coming up that people start saying, well, no, you don't have jurisdiction because everything, you're trying to relitigate the facts, and it turns on a factual issue, so you really should dismiss it. So, we have a choice here. I mean, I think you're asking us to dismiss it or asking us to affirm, to find jurisdiction and affirm the lower court, which denied qualified immunity. But I'm trying to decide here, do we have jurisdiction? Honestly, here's what I wanted to say, that the rule is that the findings of the district court govern, and the court is not permitted to re-weigh those findings. And the finding of the court, which also reviewed, and the district court's opinion makes it clear, he went through all of those videos. And so, you have declarations from, for example, Holzschlag, the defendant, and other police. But then, what happened is you have a declaration from him, and we go to the video, either that goes to that declaration or Escalante's video, which shows as best as you can from Holzschlag's perspective. And we see that what they say in their declarations are not confirmed by the video, if not contradicted, at least not confirmed. You don't have anything. So, the district court judge said exactly what this court said. Look, I wish. I'm asking if there's a disputed factual issue. See, if we could look at, the three of us could look at that video and see it completely differently than the district court did. So, if, that doesn't mean that it's a disputed fact. It just means, hey, the video doesn't, we're just, we don't know what happened here. Here's the one thing. What they're hanging their hat on to try to get around this principle, that they're not permitted to relitigate the facts, is the case of Scott v. Harris. In that case, Judge, Justice Scalia said, well, look, the normal rule is that we don't relitigate facts, we don't re-weigh facts. But, here's this video, and it's so clear beyond pure adventure, that we're going to just look at it because they can't, nobody can reasonably dispute this. So, what they're saying in this case is, that's how we ask you, Court of Appeals, to relitigate the summary judgment motion. And you're saying it's not that clear. You're saying it's not that clear. I'm saying we're very clear. The odd thing about these kind of cases is, it might mean as to when you go to trial, you don't really have any witnesses, right? I mean, unfortunately, the person I interviewed, Mr. Smith, is dead. So, what are you going to have is a bunch of officers saying, I think, I didn't see anywhere, I assume you would have told us if there was any officer that disagreed. So, all the officers are going to say, yeah, this was justified. And you're going to say, and they're going to show the video evidence and say, whether this video evidence proves it, it's definitely consistent with what all the officers were saying. And they're going to say things like, several officers went for their firearms at the same time, which itself shows it independently. And your response, I think, would just have to be undermining the officer's credibility, because you don't have any eyewitnesses or anything. There are three things. One is, with this whole business he went for, I thought he was going for a gun, so I had to kill him. The law of the Old West, right? Well, this has happened, curiously enough. The law of the Old West, I mean, I'm pretty sure that's the law in our circle. Well, no, no, no. What I meant is, somebody goes for their gun, you get to shoot them dead. I know, and I think that's the law. Well, this is the West, so maybe it's the New West as well. He also got a warning that shooting was excessive, that he could have used a taser. I think that was another argument you had, right? Which the officer said he couldn't, because the person was up and down. But those are all things that you could bring up. Judge Callahan, my only point, and let me come back, if I could, Judge, right back to your question, but let me just say this. The whole point of having this court deal with qualified immunity is because this court is able to deal with issues of law. Unless the court enforces this rule and dismisses this case as opposed to affirms, what's going to happen to the court is going to be similar to what happened with the Supreme Court in the late 60s and early 70s when they had a rule that on cases involving alleged obscenities, the court for purposes of adhering to the First Amendment would personally review the allegedly obscene movies. And so you have the justices of the Supreme Court having a Friday afternoon session where they are saying all these things. I don't want to get into facts, because if we start doing things on facts, we're going to get them all. But can you go back to what's going to happen in this case, because how are you going to actually show there's a disputed issue fact when you don't have any witnesses? We have our own video analysis. We have our own... So it's going to be a battle of the experts. It's going to be their experts and your experts. And as well as the credibility issue. And let me just talk about that on the credibility issue. You don't have to explain it to me, because I wouldn't be involved. I just kind of want to know what it would be. As they say in the officers, it's not credible. And if you look at the video, it doesn't prove either way. If it proved either way, we would decide it on qualified immunity. I think you said it doesn't prove either way, but it's more consistent with our version of the story. But it's weird that you have a version of the story. Where's your version of the story come from? You don't have a person. Well, let me just tell you, because there was this whole issue about... He put his hands down. The ruling of the court, a 38-page ruling, indicating a thoroughgoing familiarity with all of the evidence, noted that one of the commands that he was given was, put your hands behind your back. So after he's run from the dog, he's getting ready to jump and try to... I understand what you're saying. I just want you to feel for what this will be like in a district court. I think I have a good feeling for what it should be. You're asking us either to dismiss because it's literally litigating the facts or to affirm the district court as a matter of law, saying we can't say that he's entitled to qualified immunity. Well, here's what I'm really asking. But it doesn't really matter which way we do it. You wouldn't care. I mean, you would win either way, and either way we did it, the officers can continue to litigate the qualified immunity throughout the trial. That is absolutely correct, Judge Callahan. But let me just say this. I don't know whether maybe it's residual eleganciai juris or an onus. It means a sense of elegant jurisprudence. Or maybe it's just an adherence obstate principia. I did learn, I was in law school at the time when we had real... You're speaking above me at least. Which means that as a matter of doing the right thing procedurally, given what your onus questions indicated, that really, no, there is no clear, undisputable evidence. The court should dismiss this appeal for lack of jurisdiction as opposed to affirming it. And I say this, and I just need to say this. This death happened in 2015. The lawsuit was filed in 2016. And what they have done in order to re-litigate a summary judgment motion is to drag out this case another two years. And it's just not fair. The law is clear. They absolutely have a right to raise qualified immunity. They absolutely have to say, look, taking the evidence in the light most favorable to the non-moving party, this officer, you cannot fairly say that he knew what he was doing was wrong or could have known it. That's absolute. But they have no right to have two summary judgment motions separated by two years and the second one performed in the guise of an appellate brief. During the course of this argument, we have discussed the facts of the case primarily and nothing about the rule of law because the rule of law is so clear. Well, it's always clearer to the lawyers than it is to us. We deal with ambiguity. Judge Callahan, having said that, I'm going to be the first lawyer today not to trespass on your time. And with 25 seconds left, I'm going to go over there and sit down. But I do ask the court to please dismiss this for lack of jurisdiction. Thank you so much. Thank you. Okay. Your Honor, so when I talked about, real quick, when I talked about, like, this being a sort of black and white, hands and pockets not, you said, well, it could be a, but because your client actually did testify for his hands and pocket, doesn't it kind of reduce to that question? In other words, like, he can't really make the argument that he was doing something else that was threatening if he's actually, if his story is that it was his hands and his pocket, right? No, Your Honor. That's my first point on rebuttal. Officers are entitled to reasonable mistakes of fact. So even if Sgt. Polsak, in good faith, believes that the hand was going into the pocket when, Your Honor, during the video saw that it's only reaching down or, as plaintiffs concede in the record on page 235, that it's just reaching to his waistband, officers could be correct on the end. That's a good point. So it would be that either his hand went in his pocket or the officer believed him to be putting his hand in his pocket. Then you would say that would kind of encompass the facts upon which he would prevail. That's right, Your Honor, because this court in Cruz v. City of Anaheim said that when a suspect is, when officers believe or reasonably believe that a suspect is possibly armed and they're telling him to keep his hands up and he reaches down, the quote is, Your Honor, it would be unquestionably reasonable for police to shoot a suspect and continue on if he reaches for a gun in his waistband or even if he reaches there for some other reason. This court said the same thing in George v. Morris. The combination of facts here of potentially armed suspect, ordered to keep his hands up and to not reach, and then reaching into his waistband would give a reasonable officer a credible belief that this person is about to pull a gun at him. I know, but even though I've done a lot of jury work in my day, both as a judge and a lawyer, the jury is going to know he doesn't have a gun. And even though that's not something I'm going to consider here, they will consider that there. That's... If he had a gun, those are points for you and the jury. That's fair, Your Honor, but that's not... But it's not what we're dealing with here. That's right, Your Honor. With my 37 seconds remaining, I will hopefully address... You want to beat him. He went down with 15 seconds. I don't think I can, Your Honor. I wanted to... Judge Callahan, you asked about jurisdiction. So the court is correct. Jurisdiction is circumscribed in an interlocutory appeal, but the court still retains jurisdiction to review both prongs of qualified immunity as a matter of law and can reject factual determinations made by the district court if it's blatantly contradicted by the record. And then separately, this court can review materiality as well. And so the district court did rely on a couple issues. Specifically, I think this goes to what Judge Gallin's question was, if we were to conclude that we can't tell this fact, that there's a disputed issue of material fact about whether he was reaching first pockets, reached his pockets, or the officer proceeded to be reaching... I'm trying to encompass all of that. If we were to conclude that, which way should we decide this? Should we dismiss... Would we dismiss the appeal, or would we affirm the district court? Well, both outcomes are... No, I know. I know. It was Sophie's choice, Your Honor. But I think, given counsel's concession, that the officer here would still be able to raise the same qualified immunity arguments under either result. I don't think that it ends up making an impact on the case. I think the proper results would be, depending on the court's reasoning, if the court finds there's... I don't think it does. If you lose on that, I don't think it makes a difference going forward. But what it does make a difference in terms of the jurisprudence, because knowing lawyers, as I do, if there really isn't a factual dispute, they're always going to say that and say to dismiss things, and that the court doesn't have jurisdiction, and it completely eviscerates the separate step of looking to whether someone's entitled to qualified immunity. But the case law is kind of murky on this whole thing. I think the dissent in the state of Anderson v. Marsh says exactly that, Your Honor. But in this case, because of the video evidence, the court should find that the video evidence blatantly contradicts the findings in the record and grant qualified immunity here. Thank you, Your Honor. Thank you both. And this matter will stand submitted, and this court is in recess until tomorrow at 9 a.m. Thank you, everyone. I know it was a long morning, but actually it's our longest morning this week, but it really isn't inordinately long, because when you're a trial judge, and I have a trial judge here, I was a trial judge, we actually went to court all day in units. So the only difference with appellate court is you have to keep changing gears because you have different facts all day, but we do have the capability to be in court this long. So thank you. I have to say, I think the students appreciate the questioning in the courts. The compliments were very, very much. Also, people have been awfully kind. Well, thank you. I mean, we want people to, all of you come here with dignity, and we hope that people can walk out and feel the same, that we do ask hard questions. We know that, but we hope that we don't ask them in a way that would in any way interfere with their confidence. And we've had helpful arguments for the court today, and we appreciate that. Thank you. Thank you so much. All rise. Thank you. This court and this session stands adjourned.
judges: CALLAHAN, VANDYKE, Arterton